the business records in this case were admissible under the residual hearsay exception. The business records at issue here were improperly admitted under the business records exception because, as the majority correctly concludes, Aquisto was unable to lay the proper foundation for their admission. The government, in short, did not produce a sponsoring witness satisfying the already low standard of *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986) ("[A]ll that is required is that the [sponsoring] witness be familiar with the record keeping system.").

This lack of a foundation for the admission of the business records is irrelevant, however, under the majority's holding. The residual exception, after all, is always available under the majority's theory for the admission of hearsay evidence inadmissible under the other specific hearsay exceptions, including the business records exception. The majority's holding thus appears to make it unnecessary ever to call a sponsoring witness to establish the admissibility of business records, at least so long as there is "'no indication' that the records [are] not reliable." This cannot be squared with the language of Rule 803(6), which requires "the testimony of the custodian [of the records] or other qualified witness" to vouch for the existence of the other elements of the business records exception. Nor is it clear how, as a general matter, business records introduced without the testimony of a qualified sponsoring witness can be said to have "circumstantial guarantees of trustworthiness" equivalent to those that exist when a qualified sponsoring witness testifies to the trustworthiness of the records in question.

In sum, under the majority's "close-enough" approach, the residual exception swallows all the other exceptions, as well as the rule. This court should not join the other circuits in expanding the residual hearsay exception to cover hearsay situations clearly anticipated by the drafters of the Federal Rules of Evidence. It should certainly not do so in the present case, in which an established hearsay exception clearly applied but rendered the documents inadmissible.

RECOMMENDED FOR PARTIAL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0242P (6th Cir.)
File Name:  01a0242p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

        v.                                    Nos. 99-6244/6247

JAMES M. LASTER (99-6244)
and JERRY LEAR (99-6247),
    *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 98-00001—Joseph H. McKinley, Jr., District Judge.

Argued:  April 26, 2001

Decided and Filed:  July 26, 2001

Before:  SILER and MOORE, Circuit Judges; STAGG,*
District Judge.

———————————

* The Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

---

### COUNSEL

**ARGUED:** Gerald L. Gulley, Jr., BAKER, GULLEY & OLDHAM, Knoxville, Tennessee, Allen W. Holbrook, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Appellants. Mark L. Miller, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Gerald L. Gulley, Jr., BAKER, GULLEY & OLDHAM, Knoxville, Tennessee, Allen W. Holbrook, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Appellants. Mark L. Miller, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee.

SILER, J., delivered the opinion of the court, in which STAGG, D. J., joined. MOORE, J. (pp. 12-16), delivered a separate dissenting opinion.

---

### OPINION

---

SILER, Circuit Judge. Defendants Jerry Lear and James M. Laster appeal their convictions and sentences for drug offenses. This published opinion sets forth the court's ruling as to defendants' claims that the district court erroneously admitted records involving the purchase and attempted purchase of hydriodic acid, and the impact of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), on the calculation of their respective sentences. Our decision concerning defendants' remaining appellate issues can be found in the unpublished opinion for these cases. We affirm.

### I. BACKGROUND

In 1993 James Acquisto, a detective for a state drug task force, received information from Universal Testing

This plain-language interpretation of the residual exception is sometimes described by its detractors as the "near-miss theory" of the residual exception: "[t]he doctrine that a 'near miss' under a specified exception . . . renders evidence inadmissible under [the] residual exception." *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993), *cert. denied*, 510 U.S. 1166 (1994). In the same vein, however, the majority approach might be called the "close-enough" theory of the residual exception, i.e., the doctrine that hearsay is admissible under the residual exception even when it just misses admissibility under an established exception. Such an approach makes little sense given the listing of explicit hearsay exceptions in Rules 803 and 804, exceptions that the drafters of the residual exception thought sufficient to cover anticipated (in other words, common) hearsay situations. *See United States v. Turner*, 104 F.3d 217, 221 (8th Cir. 1997) ("Allowing Turner to introduce the medical texts under [the residual exception], when Federal Rule of Evidence 803(18) specifically deals with the admissibility of this type of evidence, would circumvent the general purposes of the rules.").

The majority today rejects, in sweeping fashion, the plain-language interpretation of the residual exception. In doing so, it goes far beyond this circuit's prior holding in *Barlow*. For present purposes, *Barlow* stands for the rather narrow proposition that grand jury testimony may be admissible, in certain circumstances, under the residual hearsay exception. *Barlow*, 693 F.2d at 961-63. In the present case, the majority adopts, as a general rule apparently covering every hearsay exception, the "close-enough" reasoning of *Earles* and similar cases. It does so without discussion of the structure of the hearsay exceptions, the legislative history of the residual exception, or the specific hearsay exception at issue in the present case, the business records exception.

Given the plain language of Rule 807, the language and structure of Rules 803 and 804, and the legislative history of the Federal Rules of Evidence, this holding is badly flawed. Moreover, special considerations counsel against holding that

one of the . . . other [exceptions] must satisfy the conditions laid down for its admission, and that other kinds of evidence not covered (because the drafters could not be exhaustive) are admissible if the evidence is approximately as reliable as evidence that would be admissible under the specific [exceptions].”), *cert. denied*, 510 U.S. 858 (1993), but it is also consistent with the legislative history of the residual exception, *see* S. Rep. No. 93-1277, at 20 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7066 (“It is intended that the residual hearsay exceptions will be *used very rarely, and only in exceptional circumstances*. The committee *does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions* contained in rules 803 and 804[].”) (emphases added), and the original Advisory Committee Note to Rule 807’s predecessors, *see* Fed. R. Evid. 803(24), Advisory Committee Note (1975 Adoption) (repealed 1997) (“It would . . . be presumptuous to assume that all possible desirable exceptions to the hearsay rule have been catalogued . . . . Exception (24) and its companion provision . . . are accordingly included. They do not contemplate an unfettered exercise of judicial discretion, but they do provide for treating *new and presently unanticipated situations* which demonstrate a trustworthiness within the spirit of the specifically stated exceptions.”) (emphasis added).[1]

---

[1] *See also* 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN, & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL 1931 (7th ed. 1998) (“Unfortunately, the intent of the drafters has often been ignored . . . . A broad application of the residual exception could permit the case-by-case exception to swallow the categorical rules.”); Daniel J. Capra, *Case Law Divergence from the Federal Rules of Evidence*, 197 F.R.D. 531, 534, 543 (2000) (“Rule [807] permits the admission of residual hearsay only if that hearsay is ‘not specifically covered’ by another exception. This might seem to indicate that hearsay that ‘nearly misses’ one of the established exceptions should not be admissible as residual hearsay, because it is specifically covered by, and yet not admissible under, another exception. In fact, however, most courts have construed the term ‘not specifically covered’ by another hearsay exception to mean ‘not admissible under’ another hearsay exception.”) (citing the majority view as an “Example[] of Case Law in Conflict with the Text of the Rule, the Committee Note, or Both”).

Incorporated (“UTI”), that one of its employees, Laster, had ordered hydriodic acid, a component of methamphetamine, from Wilson Oil Company using the UTI company name without its permission.[1]

After reviewing the Wilson Oil Company documents confirming these purchases, Acquisto contacted Drug Enforcement Special Agent Gary Tennant. Together they approached Laster on July 8, 1993. Laster stated that approximately four or five months prior, he was contacted by an “unnamed older man” seeking certain chemicals including hydriodic acid, red phosphorous, and sulfuric acids through UTI. Laster stated he was acting under the assumption that he would be paid for securing these chemicals which he believed were to be used to make methamphetamine.

In a second statement provided on July 20, 1993, Laster admitted to making three trips with Lear to Illinois to pick up hydriodic acid and receiving $300 per bottle for it. On July 21, 1993, Lear gave a statement to Acquisto and Tennant corroborating these trips with Laster. He also admitted traveling alone to Illinois on two other occasions to pick up bottles of hydriodic acid. According to Lear, all of these chemicals were picked up for the “older man.” Laster’s admissions were consistent with the information contained in the Wilson Oil Company purchase documents admitted as exhibits at the 1998 trial.

A meeting was held in September 1993 between government agents, Lear, Laster, and their respective counsel whereby the defendants agreed to assist the government in its investigation of methamphetamine manufacturing in Kentucky.

---

[1] Because of the potential illegal use of hydriodic acid, a chemical diversion letter was needed to allow Wilson Oil Company to sell this product to UTI. The chemical diversion letter presented to Wilson Oil Company from UTI listed Laster as the authorized purchasing agent.

In August 1994, Officer Richard Derks of the Sturgis City Police Department stopped Lear driving a truck in a reckless manner. Laster exited the passenger side of the vehicle carrying a container and placed it on the bed of the truck. A 9mm semi-automatic pistol was removed from Lear's waistband. An additional magazine for the pistol was found in the cab of the truck along with a .32 caliber semi-automatic pistol. Draino, coffee filters, plastic tubing, Mason jars, towels, lye, an aspiration mask, a funnel, and three plaster-encased glass jars containing liquid were found in the containers in the truck bed. The liquid in the jars was later determined to be 58.2 grams of pure D-methamphetamine. This liquid also contained red phosphorous and iodine, which are consistent with the use of hydriodic acid to manufacture methamphetamine.

A bag inside the cab of the truck contained four other bags of methamphetamine weighing a total of 7.44 grams, razors, razor blades, a vial, a spoon, a lighter, pH strips, corners of plastic bags, and rubber bands. Also seized was a notebook on the dash of the truck which contained, in addition to other non-incriminating pages, references to gram quantities next to dollar figures and initials, as well as fourteen entries of drug sales totaling $2,000. Motions to suppress some of the items taken from Lear's vehicle were denied by the district court.

The defendants were tried before a jury on the following charges: Count 1, conspiracy to manufacture methamphetamine from March 1, 1993 through July 30, 1993 in violation of 21 U.S.C. § 846; Counts 2,3,4, and 5, aiding and abetting in the attempt to knowingly and intentionally manufacture methamphetamine on March 24, 1993, April 14, 1993, April 30, 1993, and May 14, 1993, respectively, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; Count 6, conspiring on August 21, 1994 to knowingly and intentionally manufacture methamphetamine in violation of 21 U.S.C. § 846; Count 7, aiding and abetting each other on August 21, 1994 in knowingly and intentionally possessing methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count 8, aiding and

former testimony, and thus specifically covered (and inadmissible) under Rule 804(b)(1), a number of circuits, including this one, have held that the grand jury testimony of an unavailable witness is admissible under the residual exception when it bears the "equivalent circumstantial guarantees of trustworthiness." *See United States v. Barlow*, 693 F.2d 954, 961-63 (6th Cir. 1982), *cert. denied*, 461 U.S. 945 (1983). *See also, e.g., United States v. Earles*, 113 F.3d 796, 800 (8th Cir. 1997) (holding that grand jury testimony, although inadmissible under other hearsay exceptions, "may . . . be considered for admission under the catch-all exception"), *cert. denied*, 522 U.S. 1075 (1998); *United States v. Marchini*, 797 F.2d 759, 764 (9th Cir. 1986) (holding that grand jury testimony was admissible under the residual exception), *cert. denied*, 479 U.S. 1085 (1987). *But see United States v. Vigoa*, 656 F. Supp. 1499, 1506 (D.N.J. 1987) (concluding "that admission of grand jury testimony under [the residual exception] is a perversion of the Federal Rules of Evidence and should not be condoned"), *aff'd*, 857 F.2d 1467 (3d Cir. 1988).

The contrary (minority) view of the residual exception is that the residual exception means what it says — i.e., that it applies to those exceptional cases in which an established exception to the hearsay rule does not apply but in which circumstantial guarantees of trustworthiness, equivalent to those existing for the established hearsay exceptions, are present. *See Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 392-93 (Fed. Cir. 1997) (holding that summaries by certain purchasers, made long after the purchases had been made, were not admissible under the residual exception because such summaries were not as trustworthy as either business records, which are covered by Fed. R. Evid. 803(6), or market reports and commercial publications, covered by Fed. R. Evid. 803(17)). Not only is this minority approach consistent with the plain language of the rule, *see United States v. Dent*, 984 F.2d 1453, 1465-66 (7th Cir.) (Easterbrook, J., concurring, joined by Bauer, C.J.) ("Rule [807] reads more naturally if we understand the introductory clause to mean that evidence of a kind specifically addressed ("covered") by

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. Laster and Lear argue that the district court erred in admitting certain business records into evidence. The majority agrees with Lear and Laster that these business records were not properly admitted into evidence under the business records exception to the hearsay rule, Fed. R. Evid. 803(6), because the government failed to lay a proper foundation. The majority concludes, however, that the court below properly admitted these records under the residual exception to the hearsay rule, Fed. R. Evid. 807. For the reasons explained below, I respectfully dissent from this holding.

The residual exception, Rule 807, reads in relevant part:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807. Despite the plain language of the rule, which states that it applies only to statements "*not specifically covered* by Rule 803 or Rule 804," some courts have applied Rule 807 to statements *not admissible* under either Rule 803 or 804. Under this approach, out-of-court statements inadmissible under either Rule 803 or 804 may still be admissible under Rule 807, even when they are of a sort "specifically covered" by Rule 803 or 804, if they possess "equivalent circumstantial guarantees of trustworthiness." Thus, for example, although grand jury testimony is arguably

abetting each other on August 21, 1994 in knowingly and intentionally manufacturing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and Count 9, aiding and abetting each other on August 21, 1994 in knowingly carrying a firearm during and in relation to drug trafficking crimes in violation of 18 U.S.C. §§ 2 and 924(c)(1).

Lear was convicted on Counts 1 through 5, and 7 through 9, and received a sentence of 211 months imprisonment. Laster was convicted on Counts 1, 3, 4, and 5, and received a sentence of 151 months imprisonment.

## II. DISCUSSION

### A. The Wilson Oil Company records

The defendants argue that the district court improperly admitted purchase records from Wilson Oil Company under the business records exception of Fed. R. Evid. 803(6). The court reviews *de novo* the district court's conclusion that this proffered evidence was not inadmissible hearsay. *See United States v. Dakota* 188 F.3d 663, 669 (6th Cir. 1999).

The records from Wilson Oil Company included four invoices dated March 24, 1993, April 14, 1993, April 30, 1993, and May 14, 1993 which respectively reflected the sale on each date of one 500 milliliter bottle of hydriodic acid, except for the May 14, 1993 invoice wherein two bottles were sold in addition to two bottles of sulfuric acid and one plastic barrel. An additional order for six 500 milliliter bottles had been sought by Laster, but was canceled by the supplier to Wilson Oil Company. Also included in these records was the chemical diversion letter signed by Laster which referenced the sale of hydriodic acid to UTI by Wilson Oil Company. The district court held that the Wilson Oil Company records were admissible under either the business records hearsay exception of Fed. R. Evid. 803(6) or the residual exception of Fed. R. Evid. 807. Acquisto was determined to be a qualified

witness under Fed. R. Evid. 803(6), and was permitted to lay the foundation upon which the records were admitted.[2]

The business records exception is available if the evidence to be introduced was (1) "made in the course of a regularly conducted business activity;" (2) "kept in the regular course of [] business;" (3) a result of a "regular practice of the business" to create the documents; and (4) "made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *United States v. Fawaz*, 881 F.2d 259, 266 (6th Cir. 1989)(quoting *Redken Labs., Inc. v. Levin*, 843 F.2d 226, 229 (6th Cir. 1988)).

Defendants attack the admissibility of the records on the grounds that Acquisto was not qualified to admit these records under the business records exception. Acquisto did not examine the books or ledger sheets of Wilson Oil Company, nor did he know whether Wilson had an accountant or bookkeeper. Neither did Acquisto ask Wilson whether these documents were prepared simultaneously with the transactions reflected thereon. Defendants thus argue that Acquisto had no personal knowledge or any familiarity with the record-keeping practices of Wilson Oil Company.

*United States v. Hathaway*, 798 F.2d 902 (6th Cir. 1986), holds that a foundation for the application of Fed. R. Evid. 803(6) may be laid, in whole or in part, "by the testimony of a government agent or other person outside the organization whose records are sought to be admitted." *Id.* at 906. The only requirement is that the "witness be familiar with the record keeping system." *Id.* Other than a few conversations between Acquisto and Wilson, there is no evidence that Acquisto was familiar with the record-keeping system of Wilson Oil Company. Therefore, the evidence was not admissible under Fed. R. Evid. 803(6).

---

[2]Mr. Wilson, the apparent sole owner and operator of Wilson Oil Company, died by the time the trial began.

### III. CONCLUSION

The district court did not err in admitting the records of Wilson Oil Company as these records were admissible under Fed. R. Evid. 807. It also did not err in calculating the amount of D-methamphetamine attributable to the defendants who were ultimately sentenced below the statutory maximum, and *Apprendi* is not triggered in this case.

All other matters having been considered in the related unpublished opinion for case nos. 99-6244, 99-6247, defendants' respective convictions and sentences are hereby **AFFIRMED**.

held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

The district court's finding that defendants intended to make D- rather than L-methamphetamine increased defendants' base offense level from 18 to 34. Under *Apprendi*, defendants argue that the determination of the type of methamphetamine they intended to make should have been resolved by a jury.

Contrary to defendants' arguments, their respective sentences do not trigger *Apprendi* because the type of methamphetamine attributed to them does not affect the statutory maximum. Since their respective sentences were not increased beyond the statutory maximum, their *Apprendi* argument has no merit. *Apprendi* does not warrant a remand of defendants' sentences for the determination of whether they attempted to manufacture D- or L-methamphetamine because the type of methamphetamine involved in this case is not an aggravating factor which "increase[s] the penalty from a nonmandatory minimum sentence to a mandatory minimum sentence, or from a lesser to a greater minimum sentence...." *United States v. Ramirez*, 242 F.3d 348, 351-52 (6th Cir. 2001). To accept defendants' arguments would require the court to expand its interpretation of *Apprendi* to include a remand for jury determination almost any time the factual findings of the district court significantly increase a sentence.

Furthermore, there is no market for L-methamphetamine because it has only one-tenth the potency of D-methamphetamine, and its main ingredient is difficult to obtain, unlike the main ingredient of D-methamphetamine. This court reached a similar conclusion in *United States v. Owusu*, 199 F.3d 329, 339 (6th Cir. 2000), when it held that the question of "whether a drug is crack or some other form of cocaine base" is a fact for the sentencing court to determine.

However, the district court did not err in admitting the purchase orders and other related documents under the residual hearsay exception of Fed. R. Evid. 807 as there was "no indication" that the records were not reliable. This rule finds an equally trustworthy statement "not specifically covered by Rule 803 or 804," admissible if it is "material," "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and its admission best serves the interests of justice. Fed. R. Evid. 807.

Although some courts have held that if proffered evidence fails to meet the requirements of the Fed. R. Evid. 803 hearsay exception, it cannot qualify for admission under the residual exception, the court declines to adopt this narrow interpretation of Fed. R. Evid. 807 as suggested by defendants. Rather, this court interprets Fed. R. Evid. 807, along with the majority of circuits, to mean that "if a statement is admissible under one of the hearsay exceptions, that exception should be relied on instead of the residual exception." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 807.03(4) (2d ed. 2000).[3] We endorse the reasoning in *United States v. Earles*, 113 F.3d 796 (8th Cir. 1997), which held that "the phrase 'specifically covered' [by a hearsay exception] means only that if a statement is *admissible* under one of the [803] exceptions, such [] subsection should be relied upon" instead of the residual exception. *Id.* at 800 (emphasis in original). Therefore, the analysis of a hearsay statement should not end when a statement fails to qualify as a prior inconsistent

---

[3] *See also United States v. Ismoila*, 100 F.3d 380, 393 (5th Cir. 1996); *United States v. Deeb*, 13 F.3d 1532, 1536-37 (11th Cir. 1994); *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993); *United States v. Guinan*, 836 F.2d 350, 354 (7th Cir. 1988); *United States v. Marchini*, 797 F.2d 759, 763 (9th Cir. 1986).

statement, but should be evaluated under the residual hearsay exception.[4]

## B.  The calculation of defendants' sentences

The calculation of the quantity of drugs upon which a defendant is sentenced is reviewed for clear error. *See United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000). Defendants' sentences were calculated under the 1993 Sentencing Guidelines which distinguished between D-methamphetamine and L-methamphetamine.  The district court determined that two ounces of pure methamphetamine could be made from each 500 milliliter bottle of hydriodic acid.  A two-ounce yield produces fifty-six grams of pure methamphetamine.  Wilson Oil Company records indicate that five bottles of hydriodic acid were purchased and an additional six bottles were ordered and then canceled.  This means that the defendants could have created 616 grams of methamphetamine.  An additional 58.2 grams of pure methamphetamine in liquid form were also seized from the defendants during the August 21, 1994 traffic stop.  Hence, the total weight of pure methamphetamine which the defendants could have produced was 674.2 grams.  Upon determining that all evidence indicated defendants' intention to create D-methamphetamine, the district court sentenced Laster to 151 months imprisonment and Lear to 211 months imprisonment.[5]

The defendants do not dispute that the 58.2 grams of liquid methamphetamine seized on August 21, 1994 were D-

---

[4]The court was leaning toward this interpretation of the residual hearsay exception in *United States v. Popenas*, 780 F.2d 545, 547-48 (6th Cir. 1985), when it reversed a district court which held that a statement failing to meet the hearsay requirements of Fed. R. Evid. 801(d)(1), involving prior inconsistent statements, can never qualify for admission under the residual hearsay exception.

[5]These sentences were on the lower end of the guideline range of 151 to 188 months for the drug convictions.  Lear received an additional sixty months because of his 18 U.S.C. § 924(c)(1) conviction under Count 9.

---

methamphetamine.  However, they contend that there is no evidence that D-methamphetamine would have been created from the hydriodic acid as the district court only relied on the testimony of Acquisto and Peter Poole, a government witness who testified as to how D- and L-methamphetamine were made and their respective potency and market value.  Thus, defendants argue that the government failed to prove that "the methamphetamine attributed to [them] was more likely than not d-methamphetamine." *United States v. Jones*, 80 F.3d 436, 439 (10th Cir. 1996); *see, e.g., United States v. Ramsdale*, 61 F.3d 825, 831 (11th Cir. 1995).

Defendants argue their case is similar to *United States v. Dudden*, 65 F.3d 1461, 1471-72 (9th Cir. 1995), in which the Ninth Circuit held it was clear error to sentence the defendant based on D- rather than L-methamphetamine when the government failed to prove that D-methamphetamine was involved. The government's evidence in *Dudden* consisted of expert affidavits regarding the predominance of D-methamphetamine in the drug marketplace.  Therefore, defendants urge this court to remand this case for sentencing based on L-methamphetamine rather than D-methamphetamine as the district court should have "err[ed] on the side of caution" and only held them responsible for the quantity of drugs for which they were "more likely than not responsible." *See United States v. Russell*, 156 F.3d 687, 690 (6th Cir. 1998)(internal quotations and citations omitted).[6]

Finally, defendants assert that their Fifth and Sixth Amendment rights were violated because the jury did not determine whether they intended to create D- or L-methamphetamine.  This argument is based on the premise that due process mandates that only a jury may determine a set of facts which increase the prescribed range of penalties to which a criminal defendant is exposed.  Defendants rely on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which

---

[6]Under the 1993 Sentencing Guidelines, the base offense level for D-methamphetamine was 28 while the base offense level for L-methamphetamine was 18.